IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.

LARRY VINCENT LAWSON,

                 Defendant.
_____

**REPORT AND RECOMMENDATION**

11-CR-00266-RJA-JJM-1

        This case was referred to me on August 31, 2011 by Hon. Richard J. Arcara for supervision of all pretrial proceedings [2].[1] Before me is defendant's motion to suppress evidence and statements [13]. An evidentiary hearing was held on March 16, 2012 [23]. The government filed a post-hearing Memorandum of Law on August 16, 2012 [28]. Although defendant did not file a post-hearing brief, he did argue for suppression at the conclusion of the hearing [T135-37].[2]

        For the following reasons, I recommend that the motion be granted.

**BACKGROUND**

        Defendant is charged in an indictment [1] with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2), and with possession of a controlled substance containing cocaine, in violation of 21 U.S.C. §844(a). He moves to suppress a firearm, ammunition, cocaine and related paraphernalia which were seized by police following a search of his apartment at 335 Summer Street in the City of

---

[1]     Bracketed references are to CM-ECF docket entries.

[2]     "T" references are to pages of the hearing transcript [23].

Buffalo in the early morning hours of March 29, 2010, and to suppress statements which he made to police officers following the seizure.

At the suppression hearing, City of Buffalo Police Officer Craig Leone and Patrol Lieutenant Robert Rosenswie testified on behalf of the government, and defendant testified on his own behalf.

**The Government's Version of Events**

Officer Leone testified that at approximately 4:00 a.m. on March 28, 2010, he and his partner, officer Richard Manley, were dispatched to 335 Summer Street, a high rise building in the City of Buffalo, to investigate complaints of drug activity [T6]. They were directed to apartments 206 and 807 [T28]. They "gained entry into the building and . . . didn't really observe anything out of the ordinary that night" [T6].

Later that evening they were again dispatched to the same location, arriving shortly before midnight. While standing in the hallway outside apartment 807, they heard a loud male voice coming from apartment 806, stating "I'll hit you off" [T6]. Officer Leone stated that, based on his experience, he clearly recognized that phrase as relating to a drug transaction [T7]. They knocked on the door to apartment 806 and announced themselves as police officers. When defendant opened the door they asked him if everything was all right, and he answered yes [T9-10]. They told him they were investigating narcotics complaints, and asked if they could come in and speak to him, whereupon he invited them in [T10]. From the hallway they could see a computer desk in the apartment containing a scale, powdery residue, and a plastic baggie which were indicative of narcotics dealing [T12]. They asked him what

was on the scale, and he replied that it was from the old apartment, he had just moved in [T13].

They then asked defendant if they could search the apartment, and he replied "search anywhere you want. You can look anywhere you want. I have nothing to hide" [T14]. When they entered his bedroom, they observed a marijuana cigarette on his dresser and a plastic bag containing marijuana on the floor [T15]. Officer Leone asked defendant who owned the marijuana, and defendant said it was his. Defendant then repeated that he had nothing to hide, and again invited them to search anywhere [T15]. He stated "all I have is that marijuana, smoke a little weed, search anywhere you want" [T54]. Inside a shaving kit under the bed they found a Tech 9 semi-automatic handgun [T16]. Officer Leone placed defendant under arrest, and together with Lt. Rosenswie (who had arrived after they entered the apartment), placed handcuffs on him [T16].

Officer Manley then recovered a pill bottle on the dresser, inside of which was cocaine [T18]. Officer Leone found two boxes of ammunition on the closet shelf [T18]. Lt. Rosenswie administered <u>Miranda</u> warnings, and defendant agreed to speak. No threats or promises were made [T19]. Officer Leone asked defendant what he was going to do with the gun, and he responded that he was going to sell it. He said the cocaine was for his use only [T20].

Officer Leone had a consent to search form in his car. He walked the defendant out of the building and down to the car [T22]. He explained to the defendant that this was a form that authorized the search. Defendant agreed to sign the consent form (gov't Ex. 4) in order to memorialize his earlier verbal consent [T23]. He signed the form at 1:00

a.m. on March 29, 2010 [T60], and was then transported to the Erie County Holding Center [T25].

    Lt. Rosenswie testified that defendant was walking about freely in the apartment when he arrived [71]. Rosenswie was in the bedroom when the firearm was discovered [T71], and he assisted officer Leone in placing defendant under arrest [T72]' following which he administered <u>Miranda</u> warnings to defendant [T73]. Defendant then told him that the gun was not his, and that he would not have consented to the search if he had something to hide [T77].

**Defendant's Version of Events**

    Defendant testified that he had moved to apartment 806 approximately eight days prior to the search [T92]. At 11 p.m. on March 28, 2010 he was lying in bed, watching TV and speaking to a female friend on his cell phone [T95]. After hanging up the phone, he heard a loud knock at the door, then heard it again. He got out of bed and asked who was there. A voice responded "Buffalo police - we understand you have a female being held against her will" [T96]. He responded "there is nobody here but me" [T97]. The police officers walked past him into the apartment and began to search. He said "this is wrong" [T97]. One of the officers said "if you got nothing to hide, you won't mind us looking around", to which he replied "yes, I do mind you looking around" [T98]. He identified that officer as Officer Leone, and stated that "he was talking through me . . . regardless of what I was saying to him, he just continued to do what he wanted to do" [T98]. He stated that

neither Officer Leone nor Officer Manley asked for his permission to search the apartment [T101].

At that point the "white shirted officer" (Lt. Rosenswie) entered the apartment. Officer Leone said "isn't this nice of Mr. Lawson, he is letting us search his apartment". Defendant then told Lt. Rosenswie "sir, I did not give him permission to search my apartment. He is doing so against my will" [T102]. After the gun was found, Lt. Rosenswie hit defendant in the back of the head and said "you f**cker", then cuffed him [T103]. Defendant admitted telling Lt. Rosenswie that he had found the gun and thought about selling it [T104]. He also admitted telling the officers that he was right-handed when he was asked to sign the form, even though he is actually left-handed [T105]. He said they did not explain the form to him, and he was in a state of shock and didn't want to get hit again [T106]. He denied using the phrase "I'll hit you off" [T107].

When asked whether Officer Leone and Lt. Rosenswie were lying under oath, defendant stated "yes, they were" [T120]. He admitted that he had been arrested many times before, and knew that he could call an attorney if his rights were being violated [T122]. However, at the time he did not have an attorney [T120]. He denied having been given <u>Miranda</u> warnings [T123]. He admits that he did not file a complaint about being hit in the head by Lt. Rosenswie, but stated that he told his attorney and the public defender [T124-25]. When asked why he told the police that he was right-handed when he is actually left-handed, he replied "honestly, I don't know. I don't know. I was just confused and everything happened so sudden and I just, I don't know" [T126]. He did not read the consent form

because he did not have his glasses and wanted to avoid further confrontation [T126-27]. He again stated that "I never gave them consent to come in" [T130].

## ANALYSIS

**A.     Suppression of Physical Evidence**

    **1.     Has the Government Proven that Defendant Consented to the Search?**

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "[O]ne of the specifically established exceptions . . . is a search that is conducted pursuant to consent." Id. The government invokes this exception, arguing that "the defendant gave voluntarily written consent to the officers to search the entire premises. Once this consent was obtained, officers searched the residence." Government's Response [14], pp. 2-3.

"The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary . . . . Voluntariness is a question of fact determined by a totality of all the circumstances." United States v. Isiofia, 370 F.3d 226, 230-31 (2d Cir. 2004). "A preponderance of the evidence means the greater part of the believable and reliable evidence, not in terms of the number of witnesses or the length of time taken to present the evidence but in terms of the quality and the weight and convincing effect it has." Parra v. Ercole, 2010 WL 2612679, *3 (S.D.N.Y. 2010).

The government argues that "this is a credibility issue and that is all this case comes down to. Do you believe a convicted felon . . . or does the court choose to believe two distinguished officers?" [T137]. Although the government seems to suggest that to pose that question is to answer it, I disagree. While police officers are certainly deserving of respect, "they should be treated like any other witness that took the stand. You don't accept their testimony because they're police officers and you shouldn't reject their testimony because they're police officers." Warren v. Napoli, 2009 WL 2447757, **4-5 (S.D.N.Y. 2009). *See also* McKinnon v. Superintendent, Great Meadow Correctional Facility, 2011 WL 2005112, *3 (2d Cir. 2011) (Summary Order), cert. denied, 132 S.Ct. 1151 (2012) (noting with approval the trial court's instruction that the jury "should determine the credibility of police witnesses in the same manner as they would with respect to other witnesses and that police officers' testimony is not entitled to any greater weight or believability by virtue of the witness's status as a police officer").

"It is within the province of the district court as the trier of fact to decide whose testimony should be credited." Krist v. Kolombos Rest. Inc., ___F.3d___, 2012 WL 3002598, *6 (2d Cir. 2012). An adverse credibility determination is "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony". Diallo v. I.N.S., 232 F.3d 279, 287-88 (2d Cir. 2000).

The government's proof suffers from each of these flaws. For example, the officers' testimony contradicts the position which the government took prior to the hearing. At that time, the government asserted that there were earlier complaints of drug activity at defendant's apartment: "On March 29, 2010, Buffalo Police Officers responded to the

defendant's residence, 335 Summer Street, Apartment 806, Buffalo, New York. Earlier that day, there had been a report of drug trafficking at the location." Government's Response to Defendant's Motion to Suppress [14], p. 1. However, at the hearing both officers testified that the earlier complaints of drug activity related to apartments 203 and 807, whereas defendant resided in apartment 806.

Furthermore, prior to the hearing the government claimed that police searched the apartment *after* defendant had executed a written consent to search: "the defendant gave voluntarily written consent to the officers to search the entire premises. Once this consent was obtained, officers searched the residence". Government's Response to Defendant's Motion to Suppress [14], pp. 2-3. However, at the hearing, both officers testified that the written consent to search was executed after the search had already occurred.

Secondly, I find the officers' testimony that defendant consented to the search of his apartment - which he knew to contain a gun, ammunition and drugs - to be "inherently improbable" (Diallo, supra). Although the government suggests that "suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed" (Government's Post Suppression Memorandum of Law [28], p. 7 (*citing* United States v. Price, 599 F.2d 494, 503 (2d. Cir. 1979)), I consider that possibility to be extremely unlikely in this case. *See*, *e. g*., United States v. Varn, 1998 WL 382048, *3 (S.D.N.Y. 1998) ("I do not believe Officer Fitzgerald's testimony that Varn invited Fitzgerald to search his bags, which he knew contained cocaine base and heroin . . . or that he otherwise consented to the search"); United States v. Cole, 195 F.R.D. 627, 635 (N.D.Ind. 2000) (defendant who "knew that the police would discover incriminating evidence in plain view in

the basement" did not consent to a search of his home); 1 Criminal Practice Manual §25:89 (2012) ("where the suspect is aware that police will find incriminating evidence during a search, that fact militates against a finding of voluntary consent").

In addition, I was impressed by defendant's forthright demeanor at the hearing. Even during cross-examination, he confidently and adamantly insisted that he did not consent to the search of his apartment. "[A] witness's demeanor on the stand, including his or her confidence, impacts the assessment of credibility." United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir.1999); Colby v. Klune, 178 F.2d 872, 873 (2d Cir. 1950) ("demeanor . . . is recognized as an important clue to witness' credibility").

Although I admit that I am troubled by some aspects of defendant's testimony - such as his signing the consent form with his right hand when he is left-handed - "as trier of fact, the judge is entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness". Krist, 2012 WL 3002598, *6. "The obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven." Cifra v. General Electric Co., 252 F.3d 205, 215 (2d Cir. 2001).

For the reasons stated, I find that the government has failed to prove by a fair preponderance of the credible evidence that defendant verbally consented to the search of his apartment. The written consent which he subsequently executed (gov't Ex. 4) is of no effect, since the search had already occurred. See United States v. Santa, 236 F.3d 662, 678 (11th Cir. 2000) ("the fact that Ramirez signed a consent form after the search was complete does not

persuade us that his consent was not the product of the illegal arrest . . . . Ramirez had already disclosed the location of the drugs and knew that the agents had found them . . . . Ramirez had no reason to refuse to sign a form memorializing what he had already done. Thus, the consent form cannot be viewed as an intervening circumstance sufficient to dissipate the taint of Ramirez's unlawful arrest").

2.      **Do the Benefits of Deterrence Outweigh the Costs of Suppression?**

"The fact that a Fourth Amendment violation occurred - *i.e.*, that a search or arrest was unreasonable - does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009). Thus, having found that defendant did not consent to the search of his apartment, I must next consider "whether the benefits of deterrence outweigh the societal costs of the exclusionary rule". United States v. Ling Zhen Hu, 2010 WL 4451532, *9 (W.D.N.Y. 2010) (Arcara, J.).

"The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free - something that offends basic concepts of the criminal justice system." Herring, 555 U.S. at 141. Whether or not defendant is dangerous, the facts adduced at the hearing make it apparent that he is guilty of the offenses charged in the indictment. Therefore, "[t]he extent to which the exclusionary rule is justified . . . varies with the culpability of the law enforcement conduct." Id. at 143.

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule

-10-

serves to deter deliberate, reckless, or grossly negligent conduct." Id. at 144.  Thus, evidence should be suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Id. at 143. *See also* United States v. Julius  610 F.3d 60, 67 (2d Cir. 2010) ("The district court may consider whether the other circumstances of the search support a finding that the law enforcement officers had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, *requiring suppression*") (emphasis added).

       The fact that the search was "warrantless . . . entails different concerns about deterrence of police misconduct" than were present in Herring.  Julius, 610 F.3d at 67.  Here, the officers were clearly charged with knowledge of the long-established rule "that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth, 412 U.S. at 219. The only exception at issue in this case is consent - and since I find that the government has failed to prove consent, the police misconduct is "sufficiently culpable that such deterrence [resulting from the suppression of evidence] is worth the price paid by the justice system". Herring, 555 U.S. at 144.

**B.  Suppression of Statements**

       Defendant further argues that the statements which he made to police "are the unlawful fruit of the illegal search and seizure . . . and must therefore be suppressed along with the gun". Dabney Affirmation [13], ¶10.

"Of the various fruits present on the poisonous tree, perhaps the most easily identifiable is a confession resulting from an illegal search. When a defendant is confronted by law enforcement with incriminating evidence obtained by an illegal search and then makes admissions about that evidence, it is ordinarily obvious that there has been an exploitation of the illegality." United States v. Griswold, 2011 WL 7473466, *11 (W.D.N.Y. 2011) (Feldman, M.J.). "Once a defendant thinks that he has been caught 'red handed,' the futility of remaining silent can be more easily exploited by law enforcement. 'This is because the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak.'" Id. (*citing* 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §11.4(c) at 306 (4th ed.2004)). Although the parties dispute whether Miranda warnings were administered, "[g]iving a defendant *Miranda* warnings does not break the causal chain between an illegal search and a subsequent confession". United States v. Marcelino, 736 F. Supp.2d 1343, 1352 (N.D.Ga. 2010).

"The burden of proving that the statements were sufficiently attenuated to remove the taint from the unlawful search is on the government." United States v. Guzman, 724 F.Supp.2d 434, 444 (S.D.N.Y. 2010). I conclude that it has failed to satisfy that burden. *See*, e.g., Cole, 195 F.R.D. at 637 ("because the Government has produced no evidence that Cole's statements made in the basement after his arrest . . . were not tainted by the unconstitutional search for and seizure of the gun and drugs, all of this evidence is also suppressed"); Varn, 1998 WL 382048, *3 ("Varn's statements must be suppressed as the fruit of the illegal search because they were made immediately after his arrest for possessing the drugs uncovered by the search. The statements were a direct result of the search"); United

States v. Davis, 332 F.3d 1163, 1170 (9th Cir.2003) ("The facts also do not support a conclusion that the link between the search and Davis' statements is so attenuated as to dissipate the taint of the search's illegality . . . . At the time of the interview, a few hours after the search, Benedetti was aware that Davis was an ex-felon for whom possession of a firearm was a crime and that a shotgun had been found among Davis' belongings. He questioned Davis about the gun and, in response, Davis admitted to owning the gun. Under the circumstances, it cannot be doubted that the search of Davis' bag led directly to his incriminating statements").

## CONCLUSION

For these reasons, I recommend that defendant's motion to suppress [13] be granted. Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by September 21, 2012 (applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED: September 4, 2012

                                       /s/ Jeremiah J. McCarthy
                                       JEREMIAH J. MCCARTHY
                                       United States Magistrate Judge